*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BASEL JARADAT,

    *Petitioner-Appellant,*

    *v.*

JESSE WILLIAMS, Warden,

    *Respondent-Appellee.*

No. 09-3193

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-03560—Jack Zouhary, District Judge.

Argued: November 17, 2009

Decided and Filed: January 14, 2010

Before: MERRITT, CLAY, and McKEAGUE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Kenneth J. Rexford, KENNETH J. REXFORD & CO., L.L.C., Lima, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Kenneth J. Rexford, KENNETH J. REXFORD & CO., L.L.C., Lima, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    MERRITT, J., delivered the opinion of the court, in which McKEAGUE, J., joined. CLAY, J. (pp. 13-19), delivered a separate dissenting opinion.

─────────────────

**OPINION**

─────────────────

    MERRITT, Circuit Judge. Petitioner Basel Jaradat appeals the District Court's denial of his petition for a writ of habeas corpus. Jaradat was convicted of one count of vaginal rape and kidnapping. He challenges his conviction on the grounds that the prosecutor violated his constitutional rights by questioning a police witness on his post-

1

*Miranda* silence and by commenting on this silence during closing arguments. All courts that have reviewed Jaradat's appeals have held that the actions of the prosecution amounted to constitutional error under *Doyle v. Ohio,* 426 U.S. 610 (1976). The key issue on appeal is whether the *Doyle* error was harmless in light of other physical evidence, including DNA, on which the jury may have relied. We hold that the physical evidence supporting the vaginal rape charge is sufficiently weighty that the prosecution's conduct, while highly inappropriate, did not have a substantial and injurious effect on the jury's verdict. We, therefore, affirm the District Court.

## I.  FACTS AND PROCEDURAL HISTORY

This Court relies on the facts determined by the state appellate court on direct review. *See*, *e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1)(in a habeas proceeding "a determination of a factual issue made by a State court shall be presumed to be correct" unless the applicant rebuts the presumption "by clear and convincing evidence.") The Court of Appeals of Ohio set forth the following facts:

> Jaradat worked at a Marathon gas station a few blocks from the victim's home. On December 28, 2005, the victim went to the gas station to buy a pop. When she purchased the pop, Jaradat asked the victim if she was working and if she needed a job. She said she was not working and did in fact need a job. He told her to come back later for an interview.
>
> The victim went home, told her mother about the interview and job opportunity, and few hours later she returned to the gas station for the interview. During the interview/training with Jaradat, the victim received a phone call from her mother who was wondering what was taking her so long. The victim explained that Jaradat was training her and that she would be home soon.
>
> After talking to her mother, the victim told Jaradat that she needed to leave soon. Jaradat told the victim that he was closing the gas station early; he turned off the outside lights and locked the door. Jaradat then grabbed the victim by her ponytail and forced her into the back storage area where he raped her.
>
> The victim testified that Jaradat put his hand in the victim's shirt and grabbed her breast. Jaradat took off her pants and panties, and performed oral sex upon her. The victim testified that Jaradat digitally penetrated her vagina and rectum. Jaradat tried to force the victim to perform oral sex on him, and then he vaginally raped her. When it was over, Jaradat told her that

he would call her tomorrow about coming to work. The victim got dressed and went home.

The victim told her mother what happened, and they called the police. Jaradat was arrested and identified by the victim within an hour of the incident. The victim went to Fairview Hospital where a rape kit was performed.

At trial evidence revealed that Jaradat was the source of the semen from the victim's rape kit. Specifically, his semen was found in her vagina. Jaradat took the stand in his defense. Jaradat claimed that he only understood simple English and needed the assistance of an interpreter. Jaradat admitted to performing oral sex on the victim, and he testified that she performed oral sex on him. Jaradat claimed that it was a consensual encounter. He denied having vaginal intercourse with the victim. Jaradat claimed that the victim was looking for money in exchange for sexual favors, and he testified that when the victim left, she took $43.88.

*State v. Jaradat*, No. 88290, 2007 WL 1219313 at *1 (Ohio Ct. App. Apr. 26, 2007).

A grand jury indicted Jaradat on seven different charges, including five counts of rape, one count of kidnapping, and one count of gross sexual imposition. Jaradat was tried in Cuyahoga County, Ohio. After presentation of all of the evidence and three days of deliberations, the jury returned guilty verdicts on one count of rape – the vaginal rape charge – and the kidnapping charge and acquitted Jaradat of all other charges. The trial court held a sexual predator hearing and found that Jaradat was a sexually oriented offender. The trial court then sentenced Jaradat to a concurrent prison term of four years on each count.

Jaradat then appealed his conviction to the Eighth District Court of Appeals in Ohio. The Court of Appeals affirmed his conviction. Jaradat then appealed the decision of the Court of Appeals to the Ohio Supreme Court. The Ohio Supreme Court declined further review of Jaradat's claim.

After exhausting all of his state law remedies, Jaradat next filed a habeas corpus petition with the Federal District Court in the Northern District of Ohio. He brought only the following ground for relief to the District Court:

Ground One: The conviction of Basel Jaradat was accomplished by the prosecution egregiously violating his right to counsel and his right to remain silent, through comment upon assertion of those rights and that violation was not harmless error, instead depriving Mr. Jaradat of a fair trial and drawing into question the verdict.

The District Court referred Jaradat's case for a magistrate's report and recommendation. After noting that case was "extremely close," the magistrate recommended that the District Court deny Jaradat's petition for writ of habeas corpus. *Jaradat v. Williams*, No. 1:07 CV 3560, slip op. at 17 ( N.D. Ohio Nov.4, 2008). The District Court followed the magistrate's recommendation and denied Jaradat's petition. *Jaradat v. Williams*, No. 1:07 CV 3560, 2009 WL 161342 (N.D. Ohio Jan. 22, 2009). Jaradat timely appealed.

## II.  CORRECTION OF RECORD BELOW

Before beginning an analysis of this case, this Court corrects a crucial factual irregularity in the lower court's opinions and the state's brief. At trial, the prosecution accused Jaradat of five rape acts: (1) fellatio, (2) cunnilingus, (3) anal penetration, (4) digital vaginal penetration, and (5) vaginal intercourse. The jury convicted him only of the vaginal intercourse charge.

Both the magistrate judge and district court judge believed that Jaradat claimed consent for the fellatio, cunnilingus, anal penetration and digital penetration charges. As we read the trial transcript, Jaradat only claimed consent for the two counts concerning oral sex. He denied that all other acts even occurred.[1] This error affected the magistrate judge's opinion because it reasoned that the jury acquitted Jaradat of every charge for which he argued consent. The magistrate judge also believed that the jury convicted Jaradat for the only act he claimed did not happen. This factual mistake directly impacted the Magistrate Judge's understanding of the proceedings below and impacted the finding of harmless error. The District Court made the same mistake.

---

[1]The following exchanges are from Jaradat's testimony.

Q. Okay. Can you explain now during the time that you're doing this oral sex on her and she's giving you oral sex, how did that cause her to bleed? (Discussion between the witness and interpreter in Arabic.)
A. I didn't put anything in her vagina.

Mr. Dubyak:  Did you ever touch her rectum? (Discussion between the witness and interpreter in Arabic.)
A. No, sir.

The Court:  Did you ever penetrate her with your fingers?
WITNESS: No.

Jaradat pointed out the factual error in his brief. Despite this, the state perpetuated this mischaracterization of the trial record no fewer than six times in its reply brief. *See*, *e.g.*, Appellee Br. at 9. ("Jaradat claimed at trial that four of the acts were consensual and the fifth did not occur at all.") This type of error by the state is difficult to excuse. This Court's analysis does not rely on the factual errors of the courts below, but instead, is based on the facts as presented at trial and determined by the state court.

## III. ANALYSIS

### A. *Doyle v. Ohio*

Jaradat argues that the prosecution at his trial violated his due process rights under *Doyle v. Ohio*, 426 U.S. 610 (1976). The Supreme Court, in *Doyle v. Ohio*, held that "the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619. Accordingly, it is "fundamentally unfair" to allow a prosecutor to use a defendant's post-*Miranda* warnings silence to impeach an explanation he offers at trial. *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th. Cir. 2008) (*quoting Doyle*, 426 U.S. at 618). The Supreme Court has held that *Doyle* is not a prophylactic rule to protect Fifth Amendment guarantees, but instead is rooted in "fundamental fairness and Due Process concerns." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993).

Jaradat argues that the comments made during closing argument violate his constitutional rights under *Doyle.* During its closing argument, the state implied that Jaradat's silence was evidence of recent fabrication. The prosecutor told the jury:

> He spoke so much English that on that day he neglected to tell anyone on December 28th oh, by the way, I performed oral sex on her, she performed oral sex on me, she took $40 from me I gave – *never mentioned anything of that on December 28th*. But, see, on March 29th, when we have the DNA, your semen, oh let's see what else is he going to say? It's not mine? Of course it's yours. Okay. I got another argument.

> She must have inserted it in her, and oh, I forgot to mention this thing about the $40 dollars and the sex in exchange.

(emphasis added). Here, the prosecutor attempted to impeach the explanations Jaradat offered at trial by emphasizing that Jaradat never mentioned them to the police after he was arrested. This is a deliberate *Doyle* violation. We find that the prosecution in Jaradat's trial committed constitutional error by commenting during closing argument on Jaradat's post-arrest silence.

Jaradat also argues that the prosecution committed *Doyle* violations when questioning the lead detective on the case, Detective Jody Remington. At trial, the prosecution questioned Detective Remington about her interaction with Jaradat following his arrest. The following exchanges are also *Doyle* violations:

> Q. And when you advised the defendant of his rights, did he respond to you?
> A. He did.
> Q. And what was his response?
> A. He told me that he would prefer to have an attorney present with him before he made a statement.
>
> Q. Now, when you speak to a defendant, is that his or her opportunity to tell you his or her side of the story?
> Mr. Dubyak: Objection, objection.
> The Court: Overruled.
> A. Yes, there's two sides to every story, and we want to hear both sides.
>
> Q. At any time on December the 29th, did the defendant ever advise you that any type of sexual contact, any type, took place between him and the victim?
> A. No, he didn't.
> Mr. Dubyak: Objection
> The Court: Grounds?
> Mr. Dubyak: Well –
> The Court: Maybe we should come to sidebar that question.
> (Thereupon, a discussion was had at the sidebar off the record.)
> The Court: Overruled.
> Q. Detective, do you remember that question? I'm sorry.
> A. Could you restate it, please?

> Q. I'm sorry. At anytime during your conversation with the defendant,
> did he admit to you or tell you that any type of sexual contact whatsoever
> took place between him and the victim?
> A. He did not.

Counsel for the state of Ohio argues that this Court cannot properly review the effect of these questions because Jaradat allegedly waived any argument related to the prosecution's questioning of post-*Miranda* silence by failing to raise it in his appeal to the Ohio Supreme Court. Contrary to the state's argument, Jaradat has properly preserved his challenges to the prosecution's questions of Detective Remington.[2] These questions amount to blatant *Doyle* violations.

The state argues that these lines of questions were for the purpose of rebutting Jaradat's claim that he did not understand the English language. This is a disingenuous, post-hoc excuse. While Jaradat did request a translator for trial and testified that he had difficulty understanding Detective Remington during their post-arrest interview, Jaradat never relied on any linguistic difficulties as a part of his defense to the rape charges. It was the prosecution who repeatedly focused on the English issue at trial. Further, an effort to show that he understood the English language does not relate to questions about his failure to tell anyone that consensual sexual activity occurred or his post-arrest decision to forego telling "his side of the story." Instead, these questions are a direct comment on his post-arrest silence. They are impermissible under *Doyle*.[3]

---

[2]Contrary to the State's false argument, the State court did find these lines of questions to violate *Doyle*. With respect to the first line of questions where Jaradat asked for an attorney, the state court opined that "colloquy should have been avoided." *State v. Jaradat*, No. 88290, 2007 WL 1219313 at *3 (Ohio Ct. App. 2007). Further, the state court seemingly made no explicit finding on the second and third lines of questions quoted above. *See id*. Because, the state court made an overall finding that a *Doyle* error occurred, Jaradat had no reason to appeal the state court's holding concerning specific lines of questions. A study of Jaradat's filings on habeas review reveal that Jaradat continued to argue that all four quoted passages were *Doyle* violations. Therefore, he properly preserved all arguments.

[3]Additionally, Jaradat did not point out all possible *Doyle* violations, including two instances where the prosecution cross-examined him and a comment made during opening statements. This Court will not consider these passages as independent *Doyle* violations, because petitioner has waived them. But, the various instances in which the prosecutor mentions post-arrest silence informs this Court's analysis as to the prejudicial effect on the jury. *See Brecht*, 507 U.S. at 641 (adopting *Kotteakos v. United States*, 328 U.S. 750, 762 (1946) (finding that a Court on harmless error review should consider "the proceedings in their entirety.")

### *B. Harmless Error*

Once it is determined that the trial court has committed a *Doyle* error, this Court on habeas review must apply a harmless error analysis. *Brecht*, 507 U.S. at 637-38. The harmless error standard emerged in the twentieth century in response to the behavior of appellate courts in reversing many cases on technical errors. *See* Jeffrey O. Cooper, *Searching for Harmlessness: Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine*, 50 U. KAN. L. REV. 309, 314 (2002). In *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), the Supreme Court held that an error is deemed harmless unless it "had substantial or injurious effect or influence in determining the jury's verdict." In 1993, the Supreme Court resurrected the "substantial and injurious effect" standard from *Kotteakos* to address errors on collateral review. *Brecht,* 507 U.S. at 623.

Under the *Brecht* standard, the Government has the burden of showing that the error was harmless. *Ruelas v. Wolfenbarger*, 580 F. 3d 403, 413 (6th Cir. 2009) (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Further, if the court is in "grave doubt" about whether the error had a substantial effect on the jury, then the error is not harmless. *Gravely v. Mills*, 87 F.3d 779, 789 (6th Cir. 1996) (quoting *O'Neal*, 513 U.S. at 436). Federal courts review the entire record *de novo* to determine the effect of the error. *Franklin*, 545 F.3d at 413. "Inquiry cannot merely be whether there was enough to support the result, apart from the phase affected by the error," but instead "whether the error had substantial influence." *Kotteakos*, 328 U.S. at 765. The analysis should result from "examination of the proceedings in their entirety." *Id*. at 762.

Contrary to the argument put forth in the State's brief, we need not employ an AEDPA review of the state court's finding of harmless error. The Antiterrorism and Effective Death Penalty Act ("AEDPA") was passed after the *Brecht* decision and has created some confusion in the lower courts as to whether a federal court on habeas review must review a state court decision under both the AEDPA "objectively unreasonable standard" and the *Brecht* "substantial and injurious effect standard." The Supreme Court recently addressed this confusion finding that only the *Brecht* analysis

is required.  *Fry v. Pliler*, 551 U.S. 112, 120 (2007) (noting that "it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.")(emphasis in original).  Moreover, after briefing in this case, the Sixth Circuit interpreted *Frye* to hold that the harmless error analysis under *Brecht* "is broader and thus 'subsumes' the question" of whether the state court's decision was "objectively unreasonable" under AEDPA.  *Ruelas v. Wolfenbarger*, 580 F. 3d 403, 412  (6th Cir. 2009).  Thus, we need only review the State court's finding of harmless error under *Brecht*, which also satisfies AEDPA's less stringent standard.

The Magistrate Judge is correct that the harmless error question is extremely close.  The question is: what relationship did the *Doyle* series of errors have to the vaginal rape conviction?  Reasonable minds may differ on this issue.  The state's primary, and strongest, argument is that the *Doyle* violation is harmless in light of the other physical evidence presented to jury, as well as the fact that the defendant locked the door, turned off the lights and closed the store.  *See Brecht*, 507 U.S. at 639 (noting that other evidence of guilt was weighty when finding harmless error).  Analysis of DNA found in the rape kit concluded that Jaradat's semen was inside of the victim.  On the stand, Jaradat denied ever having sexual intercourse with the victim.  At trial, when asked why his semen was found inside of the victim, he hypothesized that maybe the victim had put his semen inside of herself after he ejaculated on her stomach.  On appeal, he alleges that his semen may have dripped inside of the victim.  Neither of these theories are plausible.

There was no evidence presented to support Jaradat's claim that the victim had placed Jaradat's semen inside of her.  Further, it appears that Jaradat has abandoned this argument on appeal.  At oral argument, Jaradat's counsel pointed to the fact that seminal fluid was found on the rectal slide taken as a part of the rape kit and on the chair cushion to support his "theory of dripping."  While counsel is correct that seminal fluid was found in other places besides the vaginal swabs, this does not explain how Jaradat's semen was found inside the victim.  The nurse who performed the rape kit testified at

trial that she took the vaginal swab from inside the victim. There is no other explanation, except rape, for how Jaradat's semen was found inside the victim. This single fact plus the closing of the store erase the "grave doubt" we would otherwise have about the effect of the *Doyle* violations on the jury. It corroborates and confirms the testimony of the victim and her mother.

Moreover, an analysis of the jury's verdicts reveals that the only charge that the jury convicted on was the one charge with physical evidence. While the jury's finding as to the credibility of the victim is unclear – as evidenced by acquittals on all charges without physical evidence – the jury did convict on the sole charge supported by concrete physical proof.

Importantly, the *Doyle* violations during the trial testimony have no connection to the vaginal rape conviction. All of the prosecutor's impermissible comments concerned Jaradat's failure to claim consent on the oral rape charges at the time of his arrest. These comments, while inexcusable, are unrelated to the vaginal rape charge. The jury clearly distinguished in their verdicts between the vaginal rape charge and the other charges for which it returned a verdict for the defendant.

Jaradat also argues that during closing argument the prosecution's comments addressed the vaginal rape charge. At closing argument, the prosecution opined:

> He spoke so much English that on that day he neglected to tell anyone on December 28th oh, by the way, I performed oral sex on her, she performed oral sex on me, she took $40 from me I gave – never mentioned anything of that on December 28th. But, see, on March 29th, when we have the DNA, your semen, oh let's see what else is he going to say? It's not mine? Of course it's yours. Okay. I got another argument. She must have inserted it in her, and oh, I forgot to mention this thing about the $40 dollars and the sex in exchange.

A portion of the prosecution's closing does speak to the vaginal rape charge. But, in the piece of this argument that relates to vaginal rape, the prosecution is not arguing that Jaradat should have informed police at the time of arrest that his DNA would be found inside of her. Instead, the import of this specific statement for the jury was to emphasize

the inconsistency between Jaradat's testimony at trial that he never had sexual intercourse with the victim and the presence of his semen in her vagina.  Although a *Doyle* violation, this passage  did not have a "substantial and injurious effect" on the jury's determination of guilt for the vaginal rape.  The prosecution made no other comments related to the vaginal rape charge.

If the jury had based its verdicts on defendant's silence, as our dissenting colleague speculates, consistency would have led them to return a verdict of guilty on the non-rape counts for which defendant claims consent.  The verdicts are not consistent with the idea that the jury based its verdicts on the defendant's silence.  Our conclusion to this effect may be debatable, but all of the state and federal judges who have reviewed the case have reached the same conclusion.  Therefore, our dissenting colleague goes a little far afield in his ridicule when he says that this conclusion "seems ridiculous in the extreme." (Dissenting opinion, footnote 2.)

Unlike our dissenting colleague, we are unwilling to let our inability to reconstruct the jury's thinking decide the harmless error question.  Here the defendant denied raping the victim.  He took the stand, and he denied ever penetrating her vagina.  He said no such physical contact took place.  She said he did, that he was lying.  The nurse said he did because his semen was found inside her.  We are confident that the jury based its verdict on the physical evidence, the thing that is different about the rape question, and not on the silence of the defendant when he was first interrogated.  He denied the rape, and the numerous *Doyle* violations were all directed at his claim of consent to the other sexual contacts.  For example, the prosecutor asked the jury, in violation of *Doyle*:  "Why didn't he claim consent back then instead of remaining silent?"  If the jury had based their verdicts on his silence, as our dissenting colleague claims, it seems likely that the jury would have found him guilty on the other issues too, and not returned a verdict of not guilty on all of those.  The physical evidence is what made the difference.

### IV.  CONCLUSION

The prosecution's conduct in this case was repetitive and deliberate. This type of prosecutorial conduct is reprehensible.  It is the responsibility of the judiciary to condemn and deter these types of blatant constitutional violations.  But we must also apply the *Brecht* standard objectively so that the public is not harmed by the misconduct of the prosecutor when that misconduct did not affect the outcome of the trial.  We are convinced that the jury would have returned the guilty verdict in the absence of the *Doyle* violations.  The physical evidence against Jaradat that related to the vaginal rape charge was such that the prosecution's comments did not have a substantial and injurious effect on the jury's verdict. Consequently, we believe that the error was harmless. Accordingly, the judgment of the District Court is AFFIRMED.

———————

## DISSENT

———————

CLAY, Circuit Judge, dissenting. The prosecution committed flagrant violations of Basel Jaradat's constitutional right to remain silent, thereby completely obliterating his credibility. The majority chastises the prosecutor for his misconduct but allows the conviction to stand. Because the jury rejected much of the victim's testimony, the prosecutor's comments went directly to the contested issue; and because the physical evidence is not free from ambiguity, I respectfully dissent.

The majority opinion effectively holds that the presence of Jaradat's semen on the vaginal swab combined with Jaradat's denial of vaginal penetration means that any error in Jaradat's trial must necessarily be harmless. The case is simply not so clear cut and is rife with ambiguities that leave me, at a minimum, in "grave doubt" about whether the blatant violations of *Doyle v. Ohio,* 426 U.S. 610 (1976), had a "substantial and injurious" impact on the guilty verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *See also*, *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995) (finding that where a judge was in "grave doubt" about the harmlessness of the error, "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict").

The majority, like all courts which have reviewed the record of the case, acknowledge that *Doyle* violations were committed. Respondent even agrees that a *Doyle* violation occurred. The sole question, therefore, is whether or not this clear constitutional error was merely "harmless." As the majority notes, Jaradat was accused of five counts of rape: (1) fellatio, (2) cunnilingus, (3) anal penetration, (4) digital, vaginal penetration, and (5) vaginal intercourse. He was only convicted of vaginal intercourse. The majority finds the *Doyle* violation "harmless" because of the physical evidence that Jaradat's semen was found in the victim's rape kit.[1]

———————

[1] The majority also references the fact that Jaradat locked the door, turned off the lights, and closed the store. While these are actions that could be taken by a man planning a rape, they also seem like reasonable steps that might be taken by someone before engaging in consensual oral sex, which is what Jaradat testified occurred.

The crux of the matter is, somewhat tellingly, explained best by the prosecution. In its brief, Respondent writes: "One sensible reading of the jury's verdict is this: In this case of classic he-said-she-said, the jury didn't know whom to believe. So they believed the evidence." (Respondent Br. at 26). Under the prosecution's theory, the jury needed to reject the credibility of both witnesses. Since the prosecution committed a blatant *Doyle* violation designed to destroy Petitioner's credibility, it seems preposterous to find that it is harmless error when even the Respondent admits that the jury's verdict was based on rejecting the credibility of both witnesses. Crucially, neither the majority nor Respondent point to other evidence as to why Jaradat's credibility should be questioned.

Several additional unique factors about the case further emphasize the way that the impermissible attack on Jaradat's credibility caused "a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Perhaps the most important is that the jury undoubtedly rejected much of the victim's testimony. She alleged five different sex acts, and the jury found for Jaradat on four of the five. With respect to two of these acts, Jaradat had argued consent, and with respect to two he argued that the acts did not occur. Thus, the jury found for Jaradat both where he argued consent and where he argued the acts did not occur. The jury obviously rejected at least some of Jaradat's testimony as well, since he denied the vaginal rape charge. The fact that the jury convicted Jaradat of the vaginal rape charge, however, does not in any way mean that it believed the victim's version of events. The majority states that the presence of Jaradat's semen in the victim's vagina "confirms the testimony" of the victim. (Majority Op. at 10). Considering the wholesale rejection of every other part of the victim's testimony, the presence of semen in the victim's vagina does not in any way "confirm" her story.

The majority's effort to link the physical evidence to the defendant's testimony highlights how even with the physical evidence, the *Doyle* violations in this case were not harmless. The jury's verdict is not easily condensed into one understanding of what happened. Lower courts attempted to explain the jury's verdict with the incorrect statement that the jury found against Jaradat only where he did not argue consent.

Respondent argues that the jury rejected all testimony and trusted the physical evidence. The majority appears to adopt this same reading of the jury's verdict.[2] The simple truth is that it is impossible with the mixed verdict in this case to understand what exactly motivated the jury. This same verdict could be reached by juries believing very different series of events. For instance, this verdict is consistent with a jury who may have thought that Jaradat committed all the charged offenses but were unable to find so "beyond a reasonable doubt" without corroborating physical evidence. At the same time, a jury could have flatly rejected the victim's testimony but found unconvincing Jaradat's hypothesis as to how his semen got into her vagina.

While divining what exactly a jury believed may be a fruitless task, the second outcome appears more likely. Petitioner asserts, with no rebuttal from Respondent, that the jury initially voted 11-1 to acquit on all charges and only convicted after three days of deliberation. In that situation, it seems plausible that at least one juror disbelieved Jaradat because of the *Doyle* violation. A juror could have found Jaradat more believable than the victim on the stand but reasoned that if Jaradat's current explanation was true, he would have come forward earlier. The reason a prosecutor commits a *Doyle* violation is to induce a juror to make just this calculation. The prosecution was attempting to undermine the defendant's credibility, and once Jaradat's credibility was called into question, it became difficult for a juror to believe his explanation for the rape kit finding his semen on the vaginal swab.

This scenario is all the more problematic because, despite the majority's assertions to the contrary, part of the *Doyle* violation dealt with the contested issue. The prosecutor in closing argument specifically referenced Jaradat's exercise of his *Miranda* rights on the issue of how his semen got into the victim's vagina.

---

[2]The majority is only able to construct an argument that the *Doyle* violations were harmless, alone or in combination with the prosecution's overreaching attacks on Petitioner's credibility, by engaging in a surfeit of speculation regarding the impact of the physical evidence, or the Petitioner's silence, on the jury's deliberations. The majority's unsupported contention that the jury likely responded in a discernible and predictable way to the numerous *Doyle* violations and attacks on Petitioner's credibility would be questionable under the best of circumstances. In the instant case, the majority's implied ability to invade the jury's consciousness, or the confines of the jury room, in order to divine the jury's thought processes and deliberations, seems ridiculous in the extreme.

He spoke so much English that on that day he neglected to tell anyone on December 28th oh, by the way, I performed oral sex on her, she performed oral sex on me, she took $40 from me I gave – never mentioned anything of that on December 28th. But, see, on March 29th, when we have the DNA, your semen, oh let's see what else is he going to say? It's not mine? Of course it's yours. Okay. I got another argument. She must have inserted it in her, and oh, I forgot to mention this thing about the $40 dollars and the sex in exchange.

(Trial Tr. 697-98). In no way is that colloquy, as the majority states, an emphasis on "the inconsistency between Jaradat's testimony at trial that he never had sexual intercourse with the victim and the presence of his semen in her vagina." (Majority Op. at 10-11). The first and last sentences of the paragraph are tied together with their reference to the oral sex and the $40. It strains credulity to suggest that the middle part, emphasizing Jaradat's explanation for the semen in her vagina, is not also part of the *Doyle* violation. The entire sequence is specifically designed by the prosecutor to undermine Petitioner's testimony on these issues because Petitioner had the opportunity to come forward with this information on December 28th.

The prosecutor in closing was undoubtedly making the point that Jaradat did not develop his theory for how the semen was found inside the victim until after he knew about the results of the rape kit. The prosecutor intentionally and impermissibly questioned Jaradat's credibility on the issue based on his failure to come forward initially with this theory. No other reading of this passage from the closing argument is plausible; it was clearly intended to cast doubt on Jaradat's explanation as to how his semen was found in the victim's vagina by emphasizing that Jaradat did not come forward with this story immediately. The *Doyle* violation in the closing argument therefore directly related to the contested issue of the vaginal rape. Since Jaradat's explanation may appear somewhat suspect, a *Doyle* violation in direct reference to that explanation seems particularly damaging and undoubtedly had a "substantial and injurious" influence on the jury's decision.

The majority misapprehends this argument, believing that I think the jury "based" its decision on the prosecution improperly commenting on Jaradat's silence even

though it is likely that the jury "based" its decision on the totality of what was presented at trial. This includes both the physical evidence and the improper comments on Jaradat's silence. The majority is correct that the difference between the vaginal rape and the other charges is the physical evidence, but the physical evidence alone was not, in and of itself, proof of guilt. Presumably, the jury also had to reject Jaradat's testimony, something that was much easier to do after the prosecutor violated Jaradat's right to remain silent. The majority appears to believe that had Jaradat been convicted of all counts, his habeas petition would be stronger. I disagree. The finding of not guilty on the other four counts does not mean that the jury was unmoved by the *Doyle* violations. Rather, the four not guilty verdicts more likely indicate that the jury found the victim not credible and increase the likelihood that the prosecution's improper comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776.

The inconsistency of the verdicts and the relationship of the *Doyle* violations to the conviction are potentially important enough on their own to show that the error was not harmless. Additionally, however, the physical evidence so central to the majority opinion's conclusion is not without its own ambiguities. While the parties dispute whether Jaradat vaginally penetrated the victim, both agree that he did not ejaculate in her. Therefore, the mere presence of semen in her vagina is not conclusive proof of vaginal intercourse. The victim testified that Jaradat put his penis in her vagina "maybe three or four times." (Trial Tr. at 468-69). Later, she testified that his penis was in her vagina "not long." (Trial Tr. at 498). She testified that he then removed his penis and ejaculated on her "stomach," which she later clarified as "my pubic area right underneath my stomach." (Trial Tr. 468-69). Jaradat denied any vaginal intercourse, which means the two witnesses to the event both agreed that Jaradat did not ejaculate in the defendant, and even under the victim's testimony, he had entered her for "not long."[3]

---

[3] Obviously, "not long" would still be rape if it was without consent, but the relevant factor for this analysis is how Jaradat's semen got into the victim's vagina.

Therefore, even if the jury accepted the victim's version of the story, the presence of semen in her vagina was not the result of ejaculation. These facts were ignored by the state appellate court, which held that "Jaradat's semen inside the victim's vagina, and Jaradat's denial of vaginal intercourse, but admission of other sexual conduct, constitutes overwhelming proof of Jaradat's guilt." The magistrate judge disagreed that the case was so clear but also relied on the DNA evidence without considering where Jaradat ejaculated, finding that the jury's guilty verdict on vaginal intercourse meant that it did not rest "solely" on the issue of credibility. The magistrate judge stated only that the "existence of alternative arguments regarding the import of that physical evidence [does not] sufficiently undermine the likelihood that the jury was able to reach its verdict without being unduly influenced by the prosecution's improper conduct."

The district judge finally confronted the fact that the victim testified that Jaradat did not ejaculate inside her. The district judge held that "Petitioner was not wearing a condom and fails to consider the possibility that pre-ejaculate may have remained in the victim's vagina after penetration, even if he ejaculated elsewhere." Nobody disputes the "possibility" that pre-ejaculate could account for the semen on the vaginal swab. On harmless error review, however, a court's task is not the same as on a sufficiency of the evidence claim. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error," but instead "whether the error itself had substantial influence." *Kotteakos*, 328 U.S. at 765.

Perhaps it is here where I most diverge from the majority opinion. The majority asserts that: "There is no other explanation, except rape, for how Jaradat's semen was found inside the victim." (Majority Op. at 9-10). Not even Respondent believes that the physical evidence is that strong. While questioning the reasonableness of Petitioner's theory, Respondent states: "Is it possible that [the semen] 'dripped' into the victim's vaginal canal after Jaradat ejaculated on the victim's stomach as he claims? Sure." (Respondent Br. at 24). Respondent argues that the jury, however, "was entitled to find that the semen found inside the victim's vagina was proof that a vaginal rape with Jaradat's penis occurred." *Id.* While the jury was entitled to find that it was proof of

vaginal rape, Jaradat was entitled to not have his post-arrest silence used against him, and he was further entitled to not have the impermissible use of his post-arrest silence influence the jury.

Here, even under the victim's version of events, the physical evidence could not constitute a large amount of semen. While pre-ejaculate is a reasonable explanation, it seems possible that the "leakage" argument made by Petitioner also could have led to the positive rape kit result. Petitioner testified at trial that following fellatio, he ejaculated into his own hand and that it some of it got on the victim's body. He then gave her napkins to clean up and hypothesizes that some of it got into her vagina. Contrary to the majority's assertion, this theory is not inconsistent with the "leakage" argument emphasized by Petitioner's counsel at oral argument. The cohesive theory is that Jaradat ejaculated on the victim, and in the process of cleaning up, semen got into her vagina. This may not be the only possible explanation, but it is bolstered by the fact that seminal fluid was also found on the victim's rectal swab and a chair in the room. Respondent never suggested that Petitioner's anal penetration occurred with his penis, so the presence of seminal fluid on the rectal exam supports Jaradat's leakage theory. Jaradat equally denied anal penetration and was found not guilty of that offense.

With all of these irregularities, the majority is forced to base its entire holding on the vaginal swab. Nobody disputes that the vaginal swab is evidence that Jaradat penetrated her vaginally, but our inquiry is not whether sufficient evidence supported the jury's verdict but whether the blatant and repeated *Doyle* violations had a "substantial and injurious" effect on the jury's decision. *Brecht*, 507 U.S. at 623. The rejection of much of the victim's testimony, the presence of semen on the rectal swab, the fact that the *Doyle* violations explicitly invoked Jaradat's explanation for his semen in the victim's vagina, and the consensus that Jaradat did not ejaculate in the victim all combine to show that the prosecutorial misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776.

For these reasons, I respectfully dissent.