NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0337n.06

Case No. 15-1813

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
Jun 15, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MANUEL SHEARD, IV, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| PAUL KLEE, | ) | MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | OPINION |
| | ) | |

**BEFORE: MERRITT, GILMAN, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge**. Petitioner Manuel Sheard appeals the district court's dismissal of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, we **AFFIRM** the district court's denial of habeas relief.

I.

*A. Factual Background*

Sheard's conviction arose from allegations that he sexually assaulted his daughter, N.S.,[1] when she was between the ages of six and nine. The Michigan Court of Appeals, on direct appeal, summarized the facts as follows:

---

[1] The victim, a minor at the time of the events in question and at trial, has been referred to by her initials in the state court and the district court below. We likewise identify her only by her initials.

> [Sheard's] charges arise from evidence that he sexually assaulted his daughter, who was nine at the time of his trial. She testified that the incidents began in August 2007 and continued until June 2009. She gave compelling testimony about the nature and extent of the abuse and stated that the abuse ended only after she told her aunt about it. There was also expert medical testimony that the child had injuries to her genital area including a healed scar on the perineum, which had been sutured in a previous medical visit, as well as a transection of the hymen, which had not completely healed. The physician testified that, although the transected hymen could be the result of a single penetration, it was "more of a sign of potentially repeated penetration." This is because there was "no healing of that area. It left it in two pieces that never joined together."
>
> Defendant's theory of the case was that his daughter's physical injuries were caused by a bicycle accident and that her allegations of abuse were inconsistent and contrived.
>
> After hearing the evidence, the jury found defendant guilty on all four counts.

*People v. Sheard*, No. 299084, 2011 WL 4952329, at *1 (Mich. Ct. App. Oct. 18, 2011).

### B. Prosecutor's Conduct at Trial

At trial, the prosecutor repeatedly referenced Sheard's marital infidelity. Beginning with his opening statement on the first day of trial, the prosecutor raised the issue, stating: "What you're also going to hear is that the defendant, while married to Monique Sheard, who is the mother of [N.S.], biological mother and father, married; during the course of that marriage relationship Mr. Sheard takes up with a Sarah Hale and has a child to [sic] her." (R. 6-7, PageID # 220–21.) Defense counsel at this point asked to approach the bench, and after a bench conference that was not made part of the record, the prosecutor continued, reemphasizing: "And you will hear that Manuel Sheard, the defendant, took up with Sarah Hale and had a child to [sic] her." (*Id*. at 221.)

The prosecutor's references to Sheard's extramarital affair continued throughout the witness examination portion of the trial. During his direct examination of the victim, N.S., the prosecutor asked her whether she knew Sarah Hale, who she was, and whether Sarah had a baby with N.S.'s father. Again with Tonia Lozano, Sheard's sister, the prosecutor inquired into the

nature of Sheard's relationship with Hale, asking whether Sheard was still married to N.S.'s mother, Monique Sheard, when he had a child with Sarah Hale. During his direct examination of Monique Sheard, the prosecutor again brought up Sheard's relationship with Sarah Hale, asking questions like: "And during the time that you have been married to Manuel Sheard is that when Sarah conceived their joint child?" "So while you are married to the defendant he has a baby with Sarah?" "You feel stressed about the fact that he is seeing another lady?" (R. 6-8, PageID # 280.)

On cross examination of Sheard, the prosecutor again drew attention to Sheard's relationship with Hale in the following exchange:

Q: Now, when you got up here, you took an oath to tell the truth right?
A: Yes, sir.
Q: That's like a vow?
A: Yeah.
Q: Correct?
A: Correct.
Q: And if you had ridden your daughter from behind and gone into her butt as she said, you would tell the jury that, would you?
A: Yes, I would.
Q: And if you had penetrated her repeatedly with your penis into her vagina, you would tell this jury that?
A: I would have pled guilty off the bat, sir, if that would have been the case.
Q: And if you would have put your penis in her mouth and ejaculated or put your penis in her mouth and pulled it out and ejaculated, you would tell the jury that?
A: They would have known that because I would have pled guilty.
Q: Now, you're married to Monique?
A: Yeah.
Q: And you took an oath to her too, didn't you?
A: Before I took the oath I started having an affair, my mistake.
Q: You took an oath to Monique as your wife?
A: Yes, I did.
Q: And while you are married to her, having taken an oath to her, you're having an affair with Sarah?
A: Yeah, with Sarah, but not my eight year old daughter.
Q: And at some point you've made promises or made oaths to Sarah?
. . .
Q: All right. But you're making promises to Sarah, she's writing you letters saying love, your wifey, so you've talked to her about possibly marrying her?

- 3 -

. . .
Q: So the oath to Monique doesn't mean a lot, does it?
. . .
Q: And the oath to Sarah doesn't mean a lot either, does it?
. . .
Q: So if the oath suits you, it's a good oath, and as soon as it doesn't suit you, doesn't mean anything, doesn't bind you?

(R. 6-9, PageID # 349–50.)

During his closing argument, the prosecutor continued his references to Sheard's extramarital affair, stating:

He takes an oath before he testifies. Swears to tell the truth, the whole truth and nothing but the truth. And then tells you, why, if I had repeatedly put my penis in her mouth, members of the jury, I would tell you that. Do you believe that? Members of the jury, if I repeatedly put my penis in her vagina, I would tell you that. Do you believe that? Members of the jury, if I repeatedly rode her from the back and put my penis in her anus, I would tell you that. Do you believe that?

We know how important his oaths are. He marries Monique and takes an oath to love, honor, cherish, whatever the wedding vows were. And what does he do with his oath to Monique, the mother of his two children? Why, he picks up a girlfriend. So while Monique is out earning money to support the family, he's home grilling, drinking, with his girlfriend Sarah on the front porch. That's how much his oath is worth to Monique, a woman he's lived with and is married to and has children with. Does he know you? And we know how much his oath is worth because he has Sarah [] and he promises her, I'm gonna marry you. Is he divorced? Has he filed for divorce? Does he do anything but father a child with Sarah?

. . .

What's the cost to confessing to something that's not at issue? There's no cost. . . . He wants you to believe what he's telling you. Whether he had an affair and lied to Sarah about his intentions is important as to whether he can be believed. Whether he lied to Monique while he's married to her is important to you in the context of whether he can be believed. If he's lying with the women he sleeps with, if he's lying with the women he has babies with, if he confesses to things that have no costs, is there a cost in this case? There sure is. Four counts of criminal sexual conduct first degree.

(*Id*. at PageID # 357, 359.) Although less damaging, as it was made after Sheard had been convicted and outside the presence of the jury, the prosecutor carried his "theory of the case"

through to Sheard's sentencing, stating: "This defendant was married when this happened. This defendant had a girlfriend when this happened. He fathered children to both of them. Apparently, his sexual appetites were such that when neither of the adult females were around, his daughter, from six, to seven, to eight, became the focus of his sexual appetites." (R. 6-11, PageID # 398–99.)

> C.     *Procedural Background*

Following a three-day trial and only a few hours of deliberation, the jury convicted Sheard of four counts of first-degree criminal sexual conduct against his daughter, N.S. At sentencing, the district court sentenced Sheard to twenty-five to fifty years for each count, with the sentences to run consecutively to each other, resulting in a total sentence of 100–200 years in prison.

Sheard appealed his conviction and sentence to the Michigan Court of Appeals, arguing, among other things, that the prosecutor committed misconduct by introducing improper character evidence, namely that he had an extramarital affair, and that his defense counsel was ineffective for failing to object to this misconduct. *Sheard*, 2011 WL 4952329, at *1. The court of appeals agreed that the prosecutor's conduct was improper and that counsel had rendered deficient performance, concluding that "it is plain that the prosecutor's efforts to elicit testimony about defendant's affair and his comments on the affair were improper. Moreover, given the limited circumstances under which such evidence would be admissible, it was plain error for the trial court to permit the testimony and comments." *Id*. at *2. However, the court held that Sheard was not entitled to a new trial because "[g]iven the overwhelming weight" of the evidence against him, he could not show prejudice from the misconduct or the deficient performance. *Id*. at *3. Sheard filed an application for permission to appeal to the Michigan Supreme Court,

which was denied. *People v. Sheard*, 810 N.W.2d 576 (Mich. 2012) (table). Sheard did not appeal to the United States Supreme Court or seek state collateral relief.

In 2013, Sheard filed a petition for federal habeas relief in the United States District Court for the Eastern District of Michigan. Sheard's habeas petition raised several claims; relevant to this appeal are his claims for prosecutorial misconduct and ineffective assistance of counsel. The district court held that the state court of appeals' decision that the prosecutor's misconduct was harmless error and that counsel's failure to object to the misconduct did not prejudice Sheard was not an unreasonable application of clearly established law. *Sheard v. Klee*, No. 13-CV-11681, 2015 WL 3634104, at *5–6 (E.D. Mich. June 9, 2015). The district court, however, granted a certificate of appealability on Sheard's prosecutorial misconduct claim and related ineffective assistance of counsel claim. *Id*. at *8. Sheard now appeals.

II.

In habeas proceedings, we review a district court's legal conclusions "de novo and its findings of fact for clear error." *Akins v. Easterling*, 648 F.3d 380, 385 (6th Cir. 2011) (quoting *Braxton v. Gansheimer*, 561 F.3d 453, 457 (6th Cir. 2009)). Sheard's petition is also governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") because the petition was filed after AEDPA's effective date. *See id*. (citing *Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997)).

Under AEDPA, a federal court may not grant a writ of habeas corpus on a claim that has been adjudicated on the merits by a state court unless the state court's adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the first prong of § 2254(d), a state court decision is contrary to clearly established federal law if the state court "arrives at a conclusion opposite to that reached

by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

Importantly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). "Rather, that application must be 'objectively unreasonable.'" *Id.* (citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations omitted). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Lett*, 559 U.S. at 773 (internal citations omitted).

### A. *Prosecutorial Misconduct*

Respondent first argues that Sheard's prosecutorial-misconduct claim is procedurally defaulted and may not be reviewed absent a showing of cause and prejudice. Sheard does not dispute this, but asserts that his claim of ineffective assistance of counsel supplies the requisite grounds to excuse this default. The Supreme Court has held that "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review" will suffice to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to

violate the Federal Constitution." *Id.* Here, the strength of Sheard's ineffective assistance claim relies on the merits of his prosecutorial-misconduct claim; as such, the analyses merge so that it is more beneficial to first address the merits of Sheard's prosecutorial-misconduct claim. *See, e.g.*, *Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000) (addressing first the prosecutorial-misconduct claim because the petitioner's "claim of *Strickland* ineffectiveness hinge[d] on whether the prosecutor's misconduct was plain enough for a minimally competent counsel to have objected.").[2]

We turn to the merits of Sheard's prosecutorial-misconduct claim. The district court and state court of appeals both concluded that the prosecutor's commentary and emphasis on Sheard's extramarital affair and resulting bad character were improper. Respondent does not dispute this finding, nor can he. Like its federal counterpart, the Michigan Rules of Evidence provide that, subject to certain enumerated exceptions, none of which apply here, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Mich. R. Evid. 404(a); *see also* Fed. R. Evid. 404(a) (same). In this case, the prosecutor's case strategy relied very heavily on tying Sheard's marital infidelity to his ability to be truthful. The state court of appeals aptly summarized the nature of this misconduct:

> These statements show that the prosecutor argued that people who violate their oaths are liars and, because [Sheard] violated his marital oath, he too must be a liar. That is, the prosecutor emphatically asserted that [Sheard's] marital infidelity was proof that he had a bad character—a propensity to lie—and acted in conformity with that character by committing perjury at trial.

---

[2] Because we ultimately conclude that Sheard's prosecutorial-misconduct claim lacks merit, we need not directly rule on the State's procedural-default defense. *See Johnson v. Lee*, 132 S. Ct. 1802, 1806 (2016) (per curiam) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that "the procedural-bar issue [need not] invariably be resolved first" and that, if another basis for denial "were easily resolvable against the petitioner," the non-procedural basis may be invoked instead in order to avoid "issues of state [procedural] law.")).

*Sheard*, 2011 WL 4952329, at \*2. It is clear that the prosecutor's continuous use of Sheard's affair with Sarah Hale to imply bad character and an inability to be truthful contravenes the rules of evidence and was improper.

This finding of impropriety, however, does not resolve the issue. We must still address the question of whether the prosecutor's misconduct was harmless. In other words, whether the prosecutor's introduction of the improper character evidence "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Although *Brecht* is a pre-AEDPA case, the Supreme Court has subsequently held that the *Brecht* test "subsumes" the AEDPA requirements such that a formal application of both tests is unnecessary. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). Thus, the law in this Circuit is that "*Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman*[3] under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009). This, however, does not render the state court's harmless-error determination irrelevant. As the Supreme Court has most recently clarified, "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).

To succeed on his prosecutorial-misconduct claim, Sheard must show that he was "actually prejudiced" by the prosecutor's comments, "a standard that he necessarily cannot satisfy if a fairminded jurist could agree with the [Michigan Court of Appeals'] decision that this

---

[3] In *Chapman v. California*, the Supreme held that some constitutional errors can, consistent with the Constitution, be deemed harmless, but only where the court can conclude that "it was harmless beyond a reasonable doubt." 386 U.S. 18, 22, 24 (1967).

[conduct] met the *Chapman* standard of harmlessness." *Id*. In concluding that the prosecutor's

reference to Sheard's marital infidelity was harmless, the state court noted that

> [Sheard's] daughter presented very compelling testimony about repeated sexual abuse. Further, there was medical testimony that the injuries to her vagina were consistent with having been repeatedly penetrated. Expert witnesses also opined that the injuries were not consistent with a bicycle injury, as [Sheard] would have the jury believe. Given the overwhelming weight of the testimony and physical evidence, we conclude that the prosecutor's misconduct—although quite serious and completely unnecessary given the proofs—did not prejudice [Sheard]. And, for that reason, it did not amount to plain error warranting a new trial.

*Sheard*, 2011 WL 4952329, at * 3. This conclusion is not entirely unreasonable.

Relying on *Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986), Sheard argues that the

prosecutor's statements amounted to a manipulation of the evidence against him and was not

invited by, or in response to, Sheard's defense. Therefore, Sheard argues, the prosecutor's

actions were "substantial and injurious" and cannot be considered harmless error. Sheard further

argues that the remaining evidence against him was not overwhelming and his trial hinged on the

jury's perception of the credibility of him and the victim, N.S.

At trial, the jury heard testimony from the victim, N.S. She testified concerning the first

incident, stating that her father raped her in the bed by putting "his private in [her] private." (R.

6-7, PageID # 226.) N.S. further testified that on this day, she started bleeding and that it was a

lot of blood that "started gushing out [of her] back area." (*Id*. at PageID # 227.) According to

N.S., when she arrived at the hospital, she told the doctors that she had fallen off her bicycle by

accident because her dad told her to. When asked how many times her father put his penis inside

her vagina, N.S. testified that it was more than five times. N.S. further testified that her father

put his penis inside her butt, and that this happened fewer than five times. She also testified that

her father put his penis in her mouth more than one time but fewer than five times. According to

N.S., when her father put his penis in her mouth, "white stuff" came out, and he would either take his penis out of her mouth and it would go on the floor, or he would leave it in her mouth.

On cross examination, defense counsel elicited testimony concerning N.S.'s prior recantations. In response, N.S. testified that she told her mother that she lied about her father raping her because she was scared. Defense counsel also questioned N.S. about other perceived inconsistencies in her testimony and asked her whether the only reason for telling her aunt Tonia that her father had raped her was so that she could spend all her time with her aunt. Defense counsel further inquired into a letter written by N.S. stating that none of this actually happened. N.S. responded that she said that she was lying only because she did not want her father to go to jail.

The jury also heard medical testimony concerning N.S. Dr. Lori Wylie testified to examining N.S. when N.S. came into the emergency room with what she had reported as a bicycle straddle injury. According to Dr. Wylie, while N.S. was experiencing vaginal bleeding, there was no external bruising that would have been consistent with a traumatic injury. Additionally, there was a tear that almost went through the hymen. Ultimately, Dr. Wylie refused to form an opinion as to the cause of N.S.'s vaginal laceration; however, she noted that bicycle injuries typically leave more bruising and swelling than was present in N.S.'s case. In addition, the jury heard testimony from Dr. Michelle McLean, who testified to interviewing N.S. on the night she was brought in following her disclosure. According to Dr. McLean, N.S. had informed her that her privates hurt, and upon examination, Dr. McLean noted marked redness and irritation in N.S.'s private area. Dr. Harry Fredrick also testified that there was a complete transection of N.S.'s hymen that never healed. According to Dr. Fredrick, the fact that the hymen was completely cut in two and had not healed since the initially-reported 2007 bicycle

injury was a sign of potentially repeated penetration. On cross examination, Dr. Fredrick admitted that there could be an injury that would cause the hymen to completely cut in two, but he testified that such injuries are rare and are not usually bicycle accidents.

Sheard testified in his own defense, stating that he never touched his daughter in a manner that would be considered inappropriate. Sheard testified that on the day of the alleged bicycle accident, he was watching both of his kids while they were riding their bikes. He testified that he went inside briefly to grab a beer when he heard screaming. According to Sheard, when he went outside he saw N.S. at the bottom of the stairs off the seat of her bicycle, but with her legs clinched around its frame. Sheard testified that N.S. told him that she did not stop in time when she was going up to the porch on her bicycle and slid off the chair and hit the bicycle bar. Sheard stated that he then carried her into the house and laid her down on the bed and went back outside. According to Sheard, he heard N.S. screaming again and went back in. N.S. was complaining of pain, and when he pulled her pants down, he noticed a spot of blood. It was at this time that Sheard took her to the hospital.

Based on this evidence, the jury convicted Sheard on all four counts. The weight of the evidence against Sheard, even if not overwhelming, was certainly compelling. Given the pervasive nature of the prosecutor's improper comments, we could easily conclude that these comments had *some* effect on the jury's verdict. That, however, is not the standard with which we must decide the issue. Rather, the standard is whether the prosecutor's comments had a "substantial and injurious" effect on the jury's verdict. *Brecht*, 507 U.S. at 638. This question is much more difficult to answer, and is complicated by our restraints under AEDPA. "[E]ven if reasonable minds reviewing the record might disagree about the" prejudicial effect of the prosecutor's comments, "on habeas review that does not suffice to supersede" the state court's

determination of harmlessness. *Ayala*, 135 S. Ct. at 2201 (internal citations and alterations omitted).

Sheard relies heavily on our decision in *Washington v. Hofbauer*, where we granted habeas relief based on the prosecutor making similar impermissible "bad character" commentary. 228 F.3d at 700. We note, however, that an important procedural difference between this case and *Washington* precludes us from reaching a similar result. In *Washington*, the state court of appeals refused to address the merits of the petitioner's prosecutorial-misconduct claim, finding that petitioner's counsel had failed to object to the allegedly improper remarks. *Id*. at 697. That is not the case here. The Michigan Court of Appeals reviewed Sheard's claim on the merits, and under AEDPA, we may not disturb that decision if "fairminded jurists could disagree" as to the correctness of this decision. *Harrington*, 562 U.S. at 101. Considering the evidence presented to the jury at trial, it was reasonable for the state court to conclude that the weight of the evidence against Sheard rendered the prosecutor's misconduct harmless. As a result, the district court properly denied Sheard relief on this ground.

### B. Ineffective Assistance of Counsel

We turn next to Sheard's claim that his trial counsel was ineffective for failing to object to the prosecutor's improper and continuous reference to his extramarital affair. A petitioner alleging ineffective assistance of counsel must make two showings: (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, however, we must also consider the state court's adjudication of the claim and examine whether, under § 2254(d), the state court's determination was unreasonable. *Williams*,

529 U.S. at 412. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal citations omitted). At this stage, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id*. at 101.

As with Sheard's prosecutorial-misconduct claim, the state court of appeals concluded that Sheard's trial counsel rendered deficient performance. Particularly, the state court noted that "to the extent that defendant's trial counsel failed to object to [the prosecutor's] misconduct, the failure to object fell below an objective standard of reasonableness under prevailing norms." *Sheard*, 2011 WL 4952329, at *2. Respondent does not challenge this finding and, again, it would be difficult to do so. Other than a brief interruption during the prosecutor's opening statement and a resulting bench conference, which counsel failed to place on the record, trial counsel did not make any objection to the prosecutor's improper statements. Trial counsel's silence with every mention of Sheard's "character" as it related to his beginning an affair with Sarah Hale, and worse, as it related to his ability to be truthful as a witness evidenced an ignorance of the law more than it did any trial strategy. *See Washington*, 228 F.3d at 704 (noting that counsel's failure to object to improper character evidence arose from incompetence and ignorance of the law where counsel failed to understand that evidence of the defendant's character was admissible for some uses and not others).

Under *Strickland*, however, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. The state court held that its finding of harmlessness stemming from the prosecutorial misconduct precluded a finding that, but for Sheard's counsel's failure to

object to the misconduct, there was a reasonable probability that the outcome would have been different. *Sheard*, 2011 WL 4952329, at *3. We may not disturb this finding "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101. The state court's decision that the prosecutor's misconduct did not have a substantial and injurious effect on the outcome of Sheard's trial was not unreasonable and is detrimental to Sheard's ability to show prejudice stemming from his trial counsel's deficient performance. As such, the state court's finding that Sheard failed to show prejudice was not unreasonable under *Strickland*, and the district court properly denied habeas relief on this claim.

## III.

The state court's adjudication of Sheard's claim on the merits did not result in an unreasonable application of clearly established law under AEDPA. We **AFFIRM**.

**MERRITT, Circuit Judge, dissenting.** I agree with our Court's opinion that there was gross ineffective assistance of counsel here. The state courts and the district court below recognized the failure of counsel to represent his client, a failure that seems to have led directly to what turns out to be a life sentence. I disagree, however, that we should overlook the error. I would issue the writ and let the state retry the defendant in a trial in which he has decent counsel and the opportunity to receive a more humane sentence. Our criminal justice system should not allow a man to be condemned to life imprisonment when he has been so egregiously deprived of counsel.